UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| RHONDA SUE V., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:18 CV 1292 (JMB) |
| ) | |
| NANCY A. BERRYHILL, ) | |
| Deputy Commissioner of Operations, ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

## **MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

### **I. Procedural History**

On April 27, 2015, plaintiff Rhonda Sue V. filed an application for a period of disability and disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, and protectively filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of September 9, 2013. (Tr. 170-71, 172-78). After plaintiff's applications were denied on initial consideration (Tr. 92-96, 97-101), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 104-05, 106-08).

Plaintiff and counsel appeared for a hearing on April 20, 2017. (Tr. 28-62). Plaintiff testified concerning her disability, daily activities, functional limitations, and past work. The ALJ also received testimony from vocational expert Deborah A. Determan, M.S. The ALJ issued a decision denying plaintiff's applications on November 22, 2017. (Tr. 13-22). The

Appeals Council denied plaintiff's request for review on June 28, 2018. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability and Function Reports and Hearing Testimony

Plaintiff was born in December 1964 and was 48 years old on the alleged onset date. (Tr. 191). She earned a Bachelor's degree in criminal justice, in May 2014, after her alleged onset date. (Tr. 33, 216). She lived in a mobile home with her teenaged daughter and her boyfriend, who traveled for work three weeks of every month from January through September. (Tr. 33-34, 39). She alleges that she became unable to work as the result of a fall on September 9, 2013, in which she injured her neck and back. (Tr. 32, 46). She previously worked as an administrative clerk in county government, a chemical abuse technician in a residential treatment center for adolescent boys, a substitute teacher, a cashier at a dollar store, and as a research assistant while in graduate school. (Tr. 34-39, 204). From 2006 to 2008, she managed a sports bar she owned with her then-husband. (Tr. 37, 56).

Plaintiff listed her impairments as bulging/herniated discs of the cervical and lumbar spine, cervical spondylolisthesis, cervical and lumbar foraminal stenosis, cervical and lumbar degenerative disc disease, and lumbar facet degeneration/hypertrophy. (Tr. 215). In her February 2014 Function Report (Tr. 226-39), plaintiff described her daily activities as making meals for her daughter and boyfriend, reading, watching television, and using the computer. She also fed the family dog and fish. She listed her hobbies as painting, doing arts and crafts, camping, and babysitting for her grandchildren, although she was not able to do these activities very often and needed assistance with some of them. She was no longer able to run, do yoga, dance, garden, and work due to ruptured discs in her neck and back. Her sleep was disrupted by

pain and she sometimes slept only four or five hours a night. She had difficulty with dressing and caring for her hair due to an inability to lift her right arm above her head, and needed help to get out of the tub. She did laundry, cooked, dusted, cleaned the bathrooms, and watered outdoor plants and swept the porch. She had a driver's license but, because of neck pain, could drive for only 15 minutes. She could walk five blocks before needing to rest for 10 minutes. She stated in the Function Report that she went grocery shopping once a week, spending 1.5 to 2 hours. At the April 2017 hearing, however, plaintiff testified that she no longer went to the grocery store. (Tr. 42). She was able to manage financial accounts. She restricted her social activities because she could not sit or stand for more than limited periods before needing to rest. She had no difficulty paying attention, completing tasks, or following instructions. She got along well with others, including authority figures. She normally did well at handling stress, but was presently experiencing stress and anxiety. She had no difficulty responding to changes in routine. She used an arm brace prescribed by her doctor. Plaintiff had difficulty with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, using her hands, and completing tasks. Plaintiff listed her medications as the muscle relaxer baclofen, Naproxen, Prozac, and Trazodone for sleep. (Tr. 218). In March 2017, she reported that she was taking a muscle relaxer and Naproxen for pain, vitamin D for osteoporosis, Effexor for depression, Klonopin for anxiety, and amitriptyline for sleep. She was also taking medications to treat irritable bowel syndrome (IBS), a hiatal hernia, allergies, and menopause. (Tr. 281-82).

Plaintiff testified at the April 2017 hearing that she was injured in 2013 when she fell from her back door onto concrete from a height of four feet. She testified that she sustained herniated discs in her neck and low back. (Tr. 46-47). She initially tried conservative treatment, including steroid shots, physical therapy, and chiropractic care. She had neck surgery in

3

February 2016 and lumbar surgery in January 2017. (Tr. 47). Her symptoms improved, but she still had what she described as whiplash in her neck and pain in her back when she bent over or reached too high. (Tr. 47, 52). As is discussed more fully below, she testified that she was able to stand for about 15 minutes before she had low back pain and some swelling in her legs. She then needed to lie down with a heating pad for about 10 to 15 minutes. She also testified, however, that this did not occur every day.

Plaintiff testified that, as a result of the antibiotics she took after her neck surgery, she had two bouts of Clostridium difficile (C. diff) and now suffered from IBS, which caused diarrhea and pain.[1] (Tr. 42-43). She testified that she had been treated on an emergency basis for nausea and dehydration three or four times. (Tr. 50, 52-53, 683-84). She identified the IBS as her biggest barrier to work because she had frequent bowel movements and was not always able to make it to the restroom in time. (Tr. 42-43, 52). She took a medication which helped and her doctor had recently increased the dosage. A recent scope disclosed inflammation, precancerous polyps and a hiatal hernia. She was scheduled for a second procedure in about six months. (Tr. 43-44, 51). In addition, plaintiff stated that she had bursitis in her right shoulder that impeded her ability to lift her arm above her head. (Tr. 45). She also had surgery to address carpal tunnel syndrome and a ganglion cyst that prevented her from bending her thumb. These conditions improved following the surgery. (Tr. 51-52). Finally, she testified that she had depression and anxiety and sometimes wanted to sleep all day. (Tr. 45).

Vocational expert Deborah Determan was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who was able to perform light work, who could never climb ladders, ropes, or scaffolds, could

---

[1] As noted below, plaintiff was tentatively diagnosed with IBS before her spine surgeries and C. diff infections. (Tr. 582).

4

occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. In addition, the individual could occasionally reach overhead with her right arm, and frequently handle, finger and feel. The person needed to avoid concentrated exposure to vibration and pulmonary irritants, and all exposure to moving machinery and unprotected heights. (Tr. 57). According to Ms. Determan, such an individual would be able to perform plaintiff's past work as an administrative clerk, resident aide, and bar manager. In addition, the individual could work as an information clerk, a routing clerk, a furniture rental clerk. If restricted to sedentary work, the individual could still perform plaintiff's past work as an administrative clerk, in addition to work as a document preparer, telephone quote clerk, or callout operator. (Tr. 58-59). All work would be precluded if the individual had two or more unexcused absences per month, was off-task more than 15 percent of the time, needed more than two bathroom breaks in addition to the customary three breaks per day, or who needed to lie down for 25 minutes twice during the work day. (Tr. 59-61).

    B.    **<u>Medical Evidence</u>**

        1.    <u>Medical Records</u>

On September 9, 2013, plaintiff walked out the door of her mobile home, not knowing that a workman had moved the steps away. She fell four feet to the concrete below, landing on her buttocks and striking her head. (Tr. 336). The following day, she went to the emergency department at Mercy Hospital Jefferson. (Tr. 309-12). X-rays of the left knee, right shoulder, right wrist, sacrum, and coccyx disclosed no fractures or subluxations. (Tr. 313-17). MRIs completed on September 23, 2103, disclosed minimal degenerative changes in the right shoulder, minimal disc protrusion at C4/C5 without spinal stenosis, disc protrusions at C5/C6 causing borderline spinal stenosis, and significant degenerative changes at L3-L4 with moderate stenosis.

5

(Tr. 318, 320-21, 323-24). In October 2013, she told chiropractor Nancy K. Nitsch, D.C., that she had pain in her low back and neck, between her shoulders, and in her arm. She had a total of ten chiropractic treatments between October 11 and November 6, 2013, without lasting relief. (Tr. 293-94).

Orthopedist Brett A. Taylor, M.D., offered a "spine opinion" in June 2014. (Tr. 336-39). Plaintiff reported that she experienced pain, weakness, and numbness throughout her right arm, that was worsened by raising her arm. She had difficulty with fine motor skills, such as writing and picking up small objects with her right hand. She also had neck pain that was worsened by moving her neck. In addition, she had pain in her back and right leg, without weakness or numbness. Her symptoms were aggravated by sitting and walking. She had been taking Master's level courses but had to stop due to pain. (Tr. 337). She was prescribed Baclofen and Trazadone. Following an examination, Dr. Taylor opined that plaintiff had "a complex constellation of symptoms" with "evidence of both lumbar and cervical instability" and "signs and symptoms consistent with stenosis/radiculopathy." (Tr. 338). He recommended a two-month trial of epidural or nerve root injections and physical therapy, possibly followed by surgery if plaintiff's condition did not improve. Plaintiff received nerve blocks and epidural steroid injection in August and September 2014, without lasting relief. (Tr. 357-80).

MRIs of the lumbar and cervical spine completed in October 2014 showed severe foraminal encroachment at C5-C6 and moderate stenosis at L3-L4. (Tr. 410, 414). In February 2015, Stefan Prada, M.D., of the Laser Spine Institute diagnosed plaintiff with herniated discs and spinal stenosis in both the lumbar and cervical regions. (Tr. 387-88). Dr. Prada recommended decompression surgery at C5-6 and L3-4. (Tr. 389).

6

Plaintiff also sought treatment for gastrointestinal complaints. In November 2015, she was evaluated by gastroenterologist Youssef Assioun, M.D. (Tr. 569-75). She complained of abdominal pain, with nausea and vomiting, constipation alternating with diarrhea, heartburn, and dyspepsia. She also reported that she experienced depression and anxiety. A colonoscopy and endoscopy showed a hiatal hernia, diverticulosis, and small intestinal metaplasia, but were otherwise "unremarkable." (Tr. 558-60, 561-63, 563-66, 578-582). Dr. Assioun prescribed Prilosec and Metamucil, and at follow-up in December 2015, plaintiff reported improvement in her symptoms. (Tr. 578). Dr. Assioun diagnosed plaintiff with possible GERD and IBS with diarrhea. (Tr. 582).

On January 21, 2016, plaintiff underwent right carpal tunnel and right trigger thumb releases, which relieved her symptoms. (Tr. 609-10, 458). On February 10, 2016, neurosurgeon Fangxiang Chen, M.D., performed an anterior cervical discectomy and fusion (ACDF) to address plaintiff's progressive neck pain due to worsening degenerative disc disease and associated decrease in sensation. (Tr. 458-59). At follow-up in May 2016, plaintiff reported that she still experienced some burning and neck pain, which she rated at level 2 on a 10-point scale. According to Dr. Chen, plaintiff's symptoms were almost completely resolved and she was happy with her surgical outcomes.

A few days after her ACDF surgery, plaintiff required hospital admission for abdominal pain, nausea, vomiting and diarrhea. (Tr. 475-84). She was treated for C. diff infection and improved rapidly. (Tr. 483). In April 2016, plaintiff was readmitted for a second C. diff. infection without evidence of megacolon.[2] (Tr. 487-529, 498). In June 2016, Dr. Assioun noted that plaintiff's infection cleared following treatment with antibiotics. (Tr. 543-47). She was

---

[2] Megacolon is a descriptive term that denotes dilatation of the colon that is not caused by mechanical obstruction. https://emedicine.medscape.com/article/180955-overview (last visited Mar. 25, 2019).

taking Imodium and the antispasmodic Bentyl and reported that she had no diarrhea and her pain had improved. In addition, she denied experiencing anxiety and depression. (Tr. 543-44). A sigmoidoscopy revealed diffuse mild inflammation. (Tr. 549, 699).

In September 2016, plaintiff returned to see Dr. Chen for treatment of lumbar-spine symptoms, including severe low back pain that radiated to her toes. (Tr. 656-57). When conservative treatment failed to resolve her symptoms, Dr. Chen recommended that she undergo a transforaminal lumbar interbody fusion at L3-4. (Tr. 660-61, 658-59). The surgery was completed in January 11, 2017. (Tr. 639). At her post-surgical follow up on February 21, 2017, plaintiff reported that her back pain was much improved, rating at 3 on a 10-point scale and only intermittent. (Tr. 662-63). She was again happy with her postoperative course.

On March 17, 2017, plaintiff returned to see Dr. Assioun with complaints of chronic diarrhea. (Tr. 693-99). Dr. Assioun noted that plaintiff had not been seen since April 2016 and had cancelled three follow-up appointments. She reported that she took Imodium about two or three times a week to slow down her diarrhea. Her abdominal cramps were partially relieved by Bentyl. Her heartburn was "pretty well" controlled by Prilosec. Dr. Assioun started plaintiff on Vibrezi. An endoscopy in April 2017 showed a normal esophagus, inflammation in the greater curvature of the stomach but an otherwise normal stomach, and normal duodenum. (Tr. 688).

2. Opinion evidence

On September 11, 2015, Barry Burchett, M.D., completed a consultative examination of plaintiff. (Tr. 446-51). Dr. Burchett reviewed the history of plaintiff's injuries and her course of treatment to date. Plaintiff reported that she had intermittent neck pain that radiated into her shoulder and was aggravated by turning her head and by lifting weights heavier than a gallon of milk. She reported that neck surgery had been recommended but she could not afford it. She

8

had intermittent low back pain, aggravated by lifting, coughing, or driving more than 15 minutes. She also had epigastric symptoms consistent with GERD. On examination, Dr. Burchett noted that plaintiff ambulated with a normal gait and did not have to use a handheld assistive device. She was stable, and comfortable in supine and sitting positions. She had no tenderness, redness, warmth or swelling in the shoulders, elbows, wrists or hands. She could fully extend her hands, make fists, oppose all fingers, write, and pick up a coin with both hands. She had normal range of motion of the finger joints of both hands, including the right thumb which displayed trigger-finger. Despite wearing a cervical collar to the examination, plaintiff had no tenderness of the cervical spine or paravertebral muscle spasm. Examination of her dorsolumbar spine was similarly unremarkable. She was able to stand on one leg at a time and straight leg raising was negative on both sides. She was able to walk on heels and toes, perform tandem gait, and squat without difficulty, although she complained of low back pain with this action. The ALJ noted that Dr. Burchett "observed mostly mild symptoms, which supports the . . . RFC. After he examined her, her condition deteriorated and then improved after surgery." (Tr. 20).

On August 24, 2016, Angela F. Ames-Powers, FNP-BC, of Hometown Healthcare of DeSoto, LLC, wrote a letter stating that she had treated plaintiff since October 6, 2015. Ms. Ames-Powers opined that plaintiff was not a good candidate for work at this time because she suffered from IBS with diarrhea, generalized anxiety disorder, cervicalgia, radiculopathy of the lumbar region, and unspecified other issues. In addition, she took an unidentified medication for anxiety that occasionally made her dizzy. There are no treatment records from Hometown Healthcare in the administrative transcript presently before the Court. The ALJ did not give significant weight to this opinion because, as a nurse practitioner, Ms. Ames-Powers was not an acceptable medical source as defined in the regulations at 20 C.F.R. § 404.1513. (Tr. 20).

9

Furthermore, her report was vague and did not cite any objective medical evidence to support its conclusions and lacked a function-by-function analysis. Id.

On March 24, 2017, Dr. Assioun completed a medical source statement in which he stated that plaintiff had no physical impairments and no physical limitations. (Tr. 671-73). The ALJ declined to give significant weight to this opinion, concluding that it "is unreasonable to believe that [plaintiff] has no significant residual effects from all the surgeries." (Tr. 20).

### III. Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act. See Baker v. Sec'y of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir.

2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942. Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the

findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above. (Tr. 13-22). The ALJ found that plaintiff had not engaged in substantial gainful activity since September 9, 2013, the alleged onset date.[3] (Tr. 16). At steps two and three, the ALJ found that plaintiff had the following severe impairments: IBS, status post C5-6 anterior discectomy and fusion, status post minimally invasive L3-4 transforaminal lumbar interbody fusion, status post

---

[3] The ALJ also found that plaintiff met the insured status requirements through September 30, 2014. (Tr. 15).

right carpal tunnel and right trigger thumb release, and left shoulder bursitis.[4] (Tr. 16-17). The ALJ next determined that plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[5] (Tr. 17-18). Plaintiff does not challenge this assessment.

The ALJ next determined that plaintiff had the RFC to perform light work but could only occasionally climb ramps and stairs and never climb ladders, ropes, and scaffolds. She could occasionally balance, kneel, stoop, crouch, and reach overhead with her right arm, and could frequently handle, finger, and feel. She should avoid crawling, concentrated exposure to vibration and pulmonary irritants, and all exposure to moving machinery and unprotected heights. (Tr. 18-20). In assessing plaintiff's RFC, the ALJ summarized the medical record and opinion evidence, as well as plaintiff's written reports and testimony regarding her abilities, conditions, and activities of daily living. While the ALJ found that plaintiff's severe impairments could reasonably be expected to produce some symptoms, the ALJ also determined that plaintiff's statements regarding the intensity, persistence and limiting effect of her symptoms were "not entirely consistent with" the medical and other evidence. (Tr. 19).

At step four, the ALJ concluded that plaintiff could return to her past relevant work as an administrative clerk. (Tr. 20-22). Thus, the ALJ found that plaintiff was not disabled within the

---

[4] With respect to any mental impairments, the ALJ reviewed the opinion of State agency consultant Steven Akeson, Psy. D., issued on September 22, 2015. Based on a review of the record, Dr. Akeson concluded that plaintiff had no mental impairments. (Tr. 71-72; 83-84). He noted that plaintiff did not allege disability due to mental impairments and did not identify any limitations in her daily activities due to a mental impairment. The ALJ found that Dr. Akeson's assessment, while perhaps valid on the day it was issued, did not account for plaintiff's subsequent treatment for anxiety and depression. (Tr. 17). Based on review of the medical records, the ALJ concluded that medication had effectively addressed plaintiff's conditions and that her anxiety and depression were non-severe impairments. Id. Plaintiff does not challenge this assessment.

[5] The ALJ considered the listings for major dysfunction of a joint (listing 1.02), disorders of the spine (listing 1.04), and inflammatory bowel disease (listing 5.06). (Tr. 17-18).

meaning of the Social Security Act, from September 9, 2013, the alleged date of onset, through November 28, 2017, the date of the decision.[6] (Tr. 22).

## V. Discussion

Plaintiff argues, first, that the ALJ's assessment of her subjective complaints is incomplete because he did not address her testimony that she could only stand for 15 minutes at a time and had to lie down on a heating pad twice per day. She also contends that, in determining plaintiff's RFC, the ALJ improperly relied on a medical report completed before her surgeries.

### A. Plaintiff's Subjective Complaints

Plaintiff argues that the ALJ failed to consider her testimony "that twice a day she needed to lie down . . . with a heating pad and that she could only stay standing and active for about 15 minutes at a time." [Doc. # 13 at 15 (citing Tr. 48-49)]. The vocational expert testified that no work would be available for an individual who needed to lie down at least twice during the work day for 25 minutes at a time.[7] (Tr. 61).

In evaluating a claimant's subjective complaints,[8] the ALJ must consider: (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any

---

[6] The ALJ also determined, in the alternative, that plaintiff had the RFC to perform other work available in the national economy, including information clerk, routing clerk, and furniture rental clerk. (Tr. 21-22).

[7] Presumably, counsel misspoke and intended to ask about 15-minute breaks. The Court assumes that the error is immaterial and that the vocational expert's testimony would not have changed.

[8] For decisions made on or after March 28, 2016, Social Security Ruling 16-3p eliminates the term "credibility" from the analysis of subjective complaints, clarifying that "subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2017 WL 5180304, at *2 (Soc. Sec. Admin. Oct. 25, 2017 (republished)). The factors to be considered in evaluating a claimant's statements, however, remain the same. See id. at *13 ("Our regulations on evaluating symptoms are unchanged."); see also 20 C.F.R. §§ 404.1529, 416.929.

14

functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints. Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ must acknowledge and consider the Polaski factors before discounting a claimant's subjective complaints, the ALJ "need not explicitly discuss each Polaski factor." Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010) (quoting Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)). An ALJ may discount a claimant's complaints if there are inconsistencies in the record as a whole, and the courts "will defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." Wildman, 596 F.3d at 968 (quoting Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007)). "The ALJ is in a better position to evaluate credibility, and therefore we defer to her determinations as they are supported by sufficient reasons and substantial evidence on the record as a whole." Andrews v. Colvin, 791 F.3d 923, 929 (8th Cir. 2015).

As pertains to plaintiff's claim here, the ALJ noted that plaintiff suffered chronic pain as a result of injuries to her neck and lumbar spine in her September 2013 accident. (Tr. 19). Nonetheless, she was able to complete a four-year college degree. Id. The ALJ then described the course of plaintiff's treatment, noting that her condition deteriorated over time and that she eventually required surgery at C5-6 in February 2016. In May 2016, Dr. Chen noted that surgery completely resolved plaintiff's neck pain and she had no upper extremity pain. (Tr. 471). He made similar findings in September 2016, December 2016, January 2017, and February 2017. (Tr. 656, 658, 660, 662, 637). Plaintiff underwent lumbar surgery in January 2017. In the final report from Dr. Chen from February 2017, he noted that plaintiff was doing well and that her back pain was much improved, at level 3 out of 10, and was intermittent. She had no numbness,

tingling, or weakness. She ambulated without issues and had full mobility, motor strength, and sensation. She was "happy with her postop course." She was no longer taking hydrocodone or muscle relaxants. (Tr. 662-63). Thus, the objective medical evidence does not support plaintiff's allegations of disabling back pain.

Plaintiff's daily activities are also not consistent with allegations of disabling pain. In her Function Report, she stated that she cleaned her home, prepared meals, took care of pets, drove, and went grocery shopping, and participated in hobbies such as painting, arts and crafts, camping and babysitting. At the hearing she testified that she was teaching her daughter how to drive, went shopping with her daughter, did the dishes, folded laundry, and vacuumed. (Tr. 39-41). See Ponder v. Colvin, 770 F.3d 1190, 1195 (8th Cir. 2014) (assertion of total disability undermined where claimant "performs light housework, washes dishes, cooks for her family, does laundry, can handle money and pays bills, shops for groceries and clothing, watches television, drives a vehicle, leaves her house alone, regularly attends church, and visits her family.").

Plaintiff's argument here largely depends on the following testimony:

Q: [S]ince you've had the surgeries, how long could you stand up [at the sink] and do the dishes, do you think?

A: I estimate about 15 minutes.

Q: Okay. And then what kind of symptoms do you have?

A: I get some pain in my lower back and sometimes my legs will swell.

Q: Okay. What do you do to relieve those symptoms?

A: I use a heating pad or I'll take one of my Naproxen.

Q: [D]o you do anything physically to alleviate the symptoms that you have after standing for 15 minutes?

> A: I'm sorry, what was the question?
>
> Q: [D]o you lie down or sit down, what do you do?
>
> A: I lie down with the heating pad.
>
> Q: Okay. And how long do you do that for?
>
> A: 10 to 15 minutes.
>
> Q: Okay. In a normal day, about how many times would you do that, lying down with the heating pad?
>
> A: I'd say once. <u>I don't do it very often. I mean, I don't do it every single day.</u>
>
> Q: But just on average.
>
> A: Twice maybe a day.
>
> Q: You'd lie down with a heating pad?
>
> A. Yeah.

(Tr. 47-49) (emphasis added).

The ALJ did not expressly address plaintiff's testimony on this point. As the underlined statement makes clear, however, plaintiff's testimony does not support the assertion made here that she needs to lie down twice a day with a heating pad after standing for 15 minutes. Plaintiff's argument is further undercut by her testimony that she considered her IBS, not her back pain, to be her biggest barrier to employment.

Plaintiff cites <u>May v. Astrue</u>, No. 09-CV-03480-NKL, 2010 WL 3257848 (W.D. Mo. Aug. 16, 2010), for the proposition that remand is required here because the ALJ did not explicitly address the above quoted testimony. [Doc. # 19 at 2]. In <u>May</u>, the ALJ committed several errors. For example, the ALJ noted plaintiff's diagnoses with traumatic brain injury and coronary artery disease, but failed to explain why they were not severe. <u>Id.</u> at *9. In addition, the ALJ did not mention the plaintiff's well-documented complaints of vertigo, obesity, and

anxiety. And, the ALJ failed to address a medical source statement. Id. at *10. By contrast, the ALJ here acknowledged that plaintiff complained of chronic pain before concluding that her subjective complaints were not consistent with the objective medical evidence and other evidence in the record. At most, the ALJ's silence with respect to plaintiff's testimony that she needed to lie down with a heating pad amounts to a mere deficiency in the ALJ's opinion-writing technique and does not require this Court to set aside a finding that is supported by substantial evidence. See Johnson v. Apfel, 240 F.3d 1145, 1149 (8th Cir. 2001).

Plaintiff also complains that the ALJ did not address the dosage, effectiveness and side-effects of her prescriptions for Naproxen, methocarbamol, trazadone, Klonopin, and Celexa. [Doc. # 13 at 17]. Plaintiff does not specify the significance of these medications for evaluating her claims. Furthermore, she did not testify that she had side-effects from these medications. Again, the Court concludes that the ALJ's failure to address these medications is, at most, a defect in opinion-writing technique and not a basis for setting aside the decision.

### B. Dr. Burchett's Report

Dr. Burchett evaluated plaintiff in September 2015, (Tr. 446-51), seven months after Dr. Prada recommended cervical and lumbar surgery to treat plaintiff's chronic neck and back pain and five months before Dr. Chen performed the cervical discectomy and fusion. (Tr. 388-89, 455-57). Notwithstanding Dr. Prada's finding that plaintiff needed surgery, Dr. Burchett found that she had full range of motion of the cervical spine without tenderness or spasm and with intact reflexes. Examination of her lumbar spine was similarly unremarkable. The ALJ noted that Dr. Burchett "observed mostly mild symptoms, which supports the . . . RFC. After he examined her, her condition deteriorated and then improved after surgery." (Tr. 20).

Plaintiff correctly notes that, because a claimant's RFC is a medical question, "an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007). She reasons that, because the ALJ explicitly discounted opinions of Dr. Assioun and Ms. Ames-Powers, the ALJ necessarily must have relied on Dr. Burchett's report in formulating her RFC. She argues that doing so was improper because Dr. Burchett's evaluation occurred before plaintiff's surgeries. Thus, she contends, the RFC is not supported by some medical evidence.

As defendant notes, there is no requirement that an RFC finding be supported by a specific medical opinion, Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016), or, indeed, any medical opinion at all. See Stringer v. Berryhill, 700 F. App'x 566, 567 (8th Cir. 2017) (affirming ALJ's RFC determination even though there were no medical opinions). Furthermore, the ALJ is not limited to considering only medical evidence in evaluating a claimant's RFC. Cox, 495 F.3d at 619; see also Dykes v. Apfel, 223 F.3d 865, 866 (8th Cir. 2000) (per curiam) ("To the extent [claimant] is arguing that residual functional capacity may be proved *only* by medical evidence, we disagree.") (emphasis in original). The ALJ may also consider a claimant's daily activities, subjective allegations, and any other evidence of record when developing the RFC. Hartmann v. Berryhill, No. 4:17-CV-002413-SPM, 2018 WL 4679737, at *6 (E.D. Mo. Sept. 28, 2018) (citing Cox, 495 F.3d at 619-20). Here, the ALJ fully and properly addressed plaintiff's treatment records. Dr. Chen's records establish that symptoms arising from impairments of plaintiff's cervical and lumbar spine were largely resolved by surgery. Thus, the ALJ's RFC does not depend on Dr. Burchett's report and is supported by some medical evidence. Plaintiff's second point is rejected.

\* \* \* \* \*

For the foregoing reasons, the Court finds that the ALJ's decision is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment shall accompany this Memorandum and Order.

                                        **/s/ *John M. Bodenhausen***
                                        JOHN M. BODENHAUSEN
                                        UNITED STATES MAGISTRATE JUDGE

Dated this 4th day of April, 2019.